UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  07-22570-CIV-MARTINEZ-BROWN**

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

vs.

U.S. PENSION TRUST CORP., U.S. COLLEGE TRUST CORP., ILIANA MACEIRAS, LEONARDO MACEIRAS JR., NILDO VERDEJA,

    Defendants.
_____/

## ORDER DENYING SUMMARY JUDGMENT

THIS CAUSE came before the Court upon the Plaintiff's Corrected Motion for Summary Judgment **(D.E. No. 162)** and Defendants' Motion for Summary Judgment **(D.E. No. 142)**.  For the reasons set forth below, both motions for summary judgment are DENIED.

### I.  Procedural History

The Securities and Exchange Commission ("Plaintiff" or "SEC") filed this action for injunctive and other relief asserting five causes of action against the various Defendants.  Count I charges all the Defendants with violating Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ("Securities Act").  Count II charges all Defendants with violating Sections 17(a)(2) and 17(a)(3) of the Securities Act.  Count III charges all Defendants with violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act ("Exchange Act").  Count IV charges Defendants U.S. Pension Trust Corporation ("PT") and U.S. College Trust Coporation ("CT") (collectively "Corporate Defendants") as primary violators of Section 15(a)(1) of the

Exchange Act. Count V charges Defendants Iliana Maceiras, Leonardo Maceiras, Jr., and Nildo Verdeja (collectively "Individual Defendants") with aiding and abetting violations of Section 15(a)(1) of the Exchange Act. In simple terms, Counts I-III are fraud claims. Count IV is a claim that the Corporate Defendants acted as unregistered securities broker-dealers. Count V charges the Individual Defendants with aiding and abetting the Corporate Defendants in acting as unregistered broker-dealers. The motions for summary judgment have been briefed and are ripe for adjudication.

## II. Legal Standard

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Anderson*, 477 U.S. at 248; *Matsushita Electric Indus. Co.,* 475 U.S. at 586. It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248. In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id*. at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991). The moving party "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)). *See also* Fed. R. Civ. P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Id*. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324. Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)).

A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### III.  Factual Background[1]

**A.      Defendant Identities**

PT is a Florida corporation that has operated as a sales and marketing company since 1995.  CT is a Florida corporation that has operated as a sales and marketing company since September 1997.  PT's principal place of business was in Coral Gables, Florida from December 1995 to March 2007, when it relocated to Miami, Florida.  CT has the same offices and the same employees as PT.  Neither company has ever registered with the SEC in any capacity.  Both Corporate Defendants were founded by Leonardo Maceiras, Sr., who served as president, then chief executive, and then director until his death in 2008.

Presently, Iliana Maceiras, Nildo Verdeja, and Leonardo Maceiras, Jr., run PT and CT, which operate as the same company, and make all the business decisions for both Corporate Defendants.  Iliani Maceiras, a Miami resident, is a principal of PT and an officer of CT.  She joined PT in 1995 as vice president of operations and became president, the highest ranking employee, in 2001.  She is also a shareholder of both PT and U.S. Pen Insurance Company. Leonardo Maceiras, Jr., a Miami resident, was assistant vice-president of marketing for PT from 1995 until 2002, when he was promoted to vice president of marketing.  He is also a PT shareholder.  Nildo Verdeja, a Miami resident, was PT's vice president of marketing

---

[1] Unless otherwise indicated, the facts derive from the facts in the parties' Statements of Material Facts that were not disputed or from facts to which the parties have otherwise stipulated. *See* (D.E. Nos. 143, 175, 179, 192).

from 1997 or 1998 until 2001 or 2002, when he was promoted to his current position as executive vice president. Like Ms. Maceiras, Mr. Verdeja is also a shareholder of both PT and U.S. Pen Insurance Company.

**B.     The Plans**

The Corporate Defendants offered an "Executive Plan," created some time prior to 1997, a "Corporate Plan," created in 2002, and a "College Plan," created around 1998. The Executive Plan was available to individual participants, the Corporate Plan was for groups of people within a single organization, and the College Plan was for participants seeking to save for their children's college educations.[2] Most people enrolled in the Executive Plan. Under each plan, a participant could choose to make annual contributions, monthly contributions, or a single, lump-sum contribution. Most participants chose to make annual contributions.

Each plan markets an opportunity for plan participants to invest their money in one or more mutual funds through a trust created at a U.S. Bank. Regions Bank is the most recent trustee bank, but First Union Bank and Union Planers Bank have also served as trustees. The trustee bank purchased shares in each mutual fund in its name, and the bank creates omnibus accounts to track the shares held in its name in each fund and the number of shares it held on behalf of each investor.

The SEC asserts that the Corporate Defendants are investment companies that market these plans as part of their business in selling investments in mutual funds. In support of this, they point to the Defendants' brochures, which repeatedly refer to investments as Corporate

---

[2] The SEC considers the "participants" to be "investors," a designation with which the Defendants do not agree. For the purpose of this factual summary, the Court will use the term "participants" as a neutral term.

Defendants' "products" and state that Corporate Defendants provide and will continue to provide "high quality" and "sophisticated financial products" to investor clients. (D.E. No. 169, Ex. 2 & 3 Executive Plan Brochure; Ex. 5 Corporate Plan Brochure; Ex. 7, USCT Brochure). The SEC also points to Defendants' Sales Agent contracts, which retain sales representatives in order to market the "pension plan products and other financial products developed by the [Corporate Defendants]."

The Defendants, on the other hand, assert that their business consists solely of marketing trust agreements between plan participants and the trustee bank, currently Regions Bank. Defendants assert that they do not sell mutual funds or purchase the mutual funds for the participants. Iliana Maceiras testified, "Basically we sell – market, more than anything, the fiduciary plans to potential investors." (Iliana Maceiras Dep. at 61). She explained "fiduciary plans" by stating, "in this day and age, the only way you can open up a trust would be with the lawyers . . . and a large sum of money, and a trust officer. And what we've done is put this together in a product that an international client can open up a trust and invest [in investment vehicles ranging from an insurance policy to a mutual fund] through the trust." *Id.*

There is some contradictory testimony on this issue. Defendant Verdeja testified, late in his deposition, that "[w]e don't sell mutual funds. We set up trust agreements for the client." (Verdeja 2008 Dep. at 149). On the heels of that statement, however, he testified that Defendants' sales agents sell the mutual funds. *Id.* He also testified that Defendants' marketing kits include a list of mutual funds from which investors choose. *Id.* at 104. A sales agent testified that the sales agents did not recommend particular funds to plan participants. (Myler Dep. at 8).

**C.     Defendants' Actions with respect to the Plans**

It is undisputed that the Corporate Defendants managed the investment plans they marketed. *See* (D.E. No. 179, Def's response to Pl's SMF ¶ 48). Defendant Verdeja testified that he and the other Individual Defendants managed the plans on behalf of the Corporate Defendants. (Verdeja Dep. at 88-89). Frank Lombardo, an employee of Regions Bank responsible for legal compliance, testified that the trusts held by the trustee banks were directed trusts, and the bank had no discretion regarding the management of those assets. (Lombardo Dep. at 72-73).

The parties do dispute the amount of oversight the banks had over the assets Corporate Defendants managed, and there are at least contrasting accounts of the level of oversight in evidence. Defendant Iliana Maceiras testified that at the beginning of their relationship with each trustee bank, Defendants submitted all their projections and marketing materials to the banks for compliance review. (Iliana Maceiras Dep. at 33). Lombardo, however, testified that the banks never conducted any compliance review with respect to Defendants and that the bank was not qualified to do so. (Lombardo Dep. at 41-42, 46-49). More specifically, bank employees testified that they never reviewed a copy of the illustrations that Defendants assert they used to disclose to participants the costs of their participation, discussed below. (Lombardo Dep. at 41); (Christina Dep. at 40-41, 54-55). Defendant Vederja stated that Defendants never actually discussed legal compliance with the banks in question or asked the banks to advise them about whether they were in compliance, but rather they assumed that the banks would notify them of any problem. (Rule 30(b)(6) Dep. at 8). However, Defendant Vederja later testified that, although the Corporate Defendants never asked the trustee banks about compliance, the trustee banks did review any marketing materials regarding the banks' role. (Vederja Dep. at 34-36).

In every country where the Corporate Defendants did business, they hired four to five regional directors to supervise sales agents. PT provided the regional directors and sales agents with business cards that read "U.S. Pension Trust" and had a Florida and a Latin America address. PT supervised the regional directors and channeled sales and marketing materials through them to the sales agents. The Corporate Defendants conducted regional director training sessions in Latin America and the United States. Regional directors attended at least two or three PT training sessions per year, which were led by the Individual Defendants.

The sales agents actively solicited participants until PT stopped accepting new participants on January 4, 2008. The Corporate Defendants created and printed marketing materials, which were reviewed and approved by the Individual Defendants before being mailed to the regional directors, who distributed them to the sales agents. The sales agents distributed the marketing materials to potential investors. The marketing materials included a marketing kit, brochures for the three plans, illustrations, a Trust Agreement, and a document entitled "To Participants of the Plan." Sales agents also presented potential investors with mutual fund research during sales meetings. The Corporate Defendants maintained a website that contained the same information as the marketing brochures. Additionally, in 2001 and 2002, PT advertised its investment plans in three separate issues of Nexos magazine, a Spanish-language publication owned by American Airlines and available to passengers on American Airlines flights.

Investors sent their investment checks to Corporate Defendants' sales agents. If the investments were not drawn on a United States bank account, the sales agents would convert them to United States dollars. Then, the sales agent forwarded the money to Corporate Defendants in Florida. Corporate Defendants have also accepted credit card payments since approximately

2000, and they have used their website to accept those credit card payments since 2005. After receiving the investor materials forwarded from the sales agents, the Corporate Defendants would send a letter to the investor stating that his or her investment packet was being processed. Then the Corporate Defendants would collect the enrollment documents and contributions and forward them in turn to the trustee bank. They would send a "batch header" along with those documents in order to instruct the bank what portion of the participant's contribution to invest and what portion to transfer to the Corporate Defendants' account. After receiving the paperwork, the trustee bank would remit payment back to the Corporate Defendants in the amount specified in the "batch header." That payment provided the agents' commissions, the insurance premium, and Corporate Defendants' fee.

Next, the Corporate Defendants would create investor certificates and have an official from the trustee bank sign it. The certificate included the bank's seal. It showed the names of the mutual funds where the investor's money was invested, but not the amount of money invested. (In other words, the investor certificate would not reflect how much of the investor's money had been remitted into the Corporate Defendants' account instead of into a mutual fund.) The Corporate Defendants mailed these investor certificates to the sales agents to distribute to the investors.

If investors wanted to make changes or cancel their investments, they contacted either their sales agents or Corporate Defendants' offices and filled out a form that the Corporate Defendants then forwarded to the trustee bank. They had access to their account through PT's website. Corporate Defendants also prepared and mailed annual statements. Corporate Defendants maintained several internal documents showing the amounts they took from investors'

contributions and how they spent them: investment schedules; sales agent contracts; and data entries in USPT's computer system. The Corporate Defendants did not distribute any of these documents to investors.

**D.     Costs charged to Plan Participants**

From 1995 until 2001, the amount deducted from an annual participant's contribution to the Executive Plan and remitted to the Corporate Defendants was as follows: (a) 70% in year one; (b) 35% in year two; (c) 9.2% in years three through ten; and (d) 3% from year eleven onward. Since then, the amount deducted was as follows: (a) 85% in year one; (b) 22% in year two; (c) 23% in years three through ten; and (d) 3% from year eleven onward. Corporate Defendants charged investors making monthly investments an additional three-quarters of a point each month. The trustee bank deducted a 1.5% annual fee, of which the Corporate Defendants received half.

The English-language version of the trust summary made available to plan participants made a vague and unexplained reference to "fees," while the Spanish-language version did not mention fees at all. (Exh. 3, Executive Plan Brochure). Defendants assert that the investors were nevertheless made aware of the costs of plan participation.

Specifically, Defendants assert that from 2001 onward they showed each prospective plan participant an illustration that set forth the "accumulation of funds" in their account given a disclosed rate of return. (Verdeja Decl. ¶¶ 3, 5, Exh. B); (Exh. 53-55). Each plan participant had to sign the illustration. *Id.* at ¶ 6; (June 2, 2000 PT Memorandum, Exh. D). Defendants argue than an investor could determine the costs of the program by subtracting what the illustration says the participant will have at the end of the first year from what the participant will have to

contribute, adjusting for a disclosed interest rate.[3]  *See* (Iliana Maceiras Dep. at 36).  Defendants assert that this illustration was used throughout from 2001 until 2006.  *Id.* at ¶¶ 3, 5.  Defendants assert that disclosure illustrations they began using in 2006 provided a breakdown of those costs. (Exhs. 56, F, G).

Additionally, plan participants received annual statements each year.  The statement would show the "accumulated amount" invested by the trustee bank and the "surrender value" of the participant's account.  (Exh. 58, Annual Statement).  The statement included the following explanation of the surrender value: "Surrender value reflects the market value at the print date, net of opening costs and plan administration."  *Id.*  Defendants assert that this statement provided participants with notice of the costs of the plan, because it allowed them to see the difference between the surrender value and the accumulated amount in their accounts.

Defendants also point to places in the trust agreement between the plan participant and the trustee bank that state, directly or indirectly by reference to another document, that the Corporate Defendants will receive compensation, without specifying how much.  (Exh. 3, "To the Participants of the Plan," document referenced); (Exh. 24, Trust Agreement).  Finally, sales agents for corporate Defendants testified that they provided information on fees when asked.  (Palomino

---

[3] Iliana Maceiras's testimony was that the prospective participant could discover the costs of the program by looking at the illustration and doing simple subtraction.  (Iliana Maceiras Dep. at 36).  In fact, as Defendants acknowledged in their brief, the illustration reflects amounts after a year's worth of interest.  Thus, accepting Defendant's contentions as true, a plan participant given the illustration would have to calculate and deduct that interest before being able to do subtraction to discover the costs.  For example, under Corporate Defendants' plans, an initial contribution of $2,500 would have a "surrender value" of $420 after a year with a 12% return rate.  In order to determine costs, the prospective investor would have to add 12% of $2,500 to $2,500 and then subtract the $420.  Then, if the prospective investor wanted to learn the percentage rate of the deduction for costs, he or she would have to divide the resultant $2,380 by $2,500.

Dep. at 113); (Acevedo Dep. at 129); (Myler Dep. at 163).  One of them, Mr. Myler, testified that he is required to explain to the client that out of the entire first year payment, 15% will be invested for him.  (Myler Dep. at 163).

Plaintiffs, on the other hand, have introduced testimony that the illustration put in evidence by Defendants was used only in 2001, rather than every year, and that various other illustrations were used in other years.  (Rule 30(b)(6) Dep. at 136-38).  Plaintiffs assert that illustrations used after 2001 did not define "accumulated" funds, which left investors in the dark about whether "accumulated" meant the amount the investment had grown or the total amount left in the investor's account.  *See* (Exh. 55, Illustration Version 7.4 – May 2005).  Misinterpreting "accumulated" would cause consumers to significantly underestimate the amount of fees charged.  Plaintiffs further assert that from 2002 through 2006, the graphs falsely reflect that investors would begin receiving a return on their investment in the second year.  (Exh. 23).  Plaintiffs also argue that marketing brochures that only disclosed the trustee bank's 1.5% fee misled potential investors into thinking that the 1.5% fee was the only fee.  (Exh. 6, Iliana Macieras SEC Hearing Test. at 102).  Finally, Plaintiffs have pointed to the testimony of Patricia Soto that a sampling of 250 investor files did not reveal a single illustration, suggesting that the investors did not, in fact, universally receive the illustrations.  (Soto Decl. ¶ 3, 4).

As of January 4, 2008, Regions Bank resigned as trustee, and the trust products are no longer marketed to new participants.  The Corporate Defendants continue to service and accept renewals from existing participants.

## IV.  Analysis

**A.     Counts I-III**

Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) and Rule 10b-5 of the Exchange Act proscribe fraudulent conduct in connection with the purchase or sale of securities.  15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  They "both prohibit essentially the same type of practices." *SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *16 (S.D.Fla. 2008) (citing *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979)).

"To prove a 10(b) violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980)). "To show a violation of section 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Id.*  "Finally, to show that the defendants violated section 17(a)(2) or 17(a)(3), the SEC need only show (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id.*

The requirement for material misrepresentations or materially misleading omissions is common to all three fraud counts.  Making a misrepresentation can encompass participating in a course of business that operates as a fraud on the buyers or sellers of stock.  *SEC v. Zandford*, 535 U.S. 813, 819-22 (2002); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972).  In order for a misrepresentation or omission to be material, the facts misrepresented or omitted must be "material in the sense that a  reasonable investor might have considered them important in the

making of this decision." *Affiliated Ute Citizens*, 406 U.S. at 153-154. More specifically, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

In this case, the SEC alleges that Defendants made materially misleading omissions when they failed to disclose how they distributed the participants' contribution—for example, that they took between 70% and 85% of first year contributions as fees. Defendants assert that they did make plan participants aware of the total costs of the plan. Defendants assert that their only omission was failing to provide a specific breakdown of the costs prior to 2006, and they assert that this omission is not material.

The evidence that Defendants disclosed the total costs to plan participants before they invested is Mr. Verderja's and Ms. Maceiras's testimony that all potential participants received an illustration that showed costs.[4] Additionally, one sales agent testified that he told participants that 15% of their first year's contribution was invested.[5] The evidence that they did not disclose total costs consists of testimony that a sampling of 250 participant files did not reveal even one signed illustration. Thus, there is a dispute of fact regarding whether all the participants received this

---

[4] Because of the dispute of fact regarding whether plan participants even received the illustrations, it is not necessary at this juncture for the Court to rule whether a visual illustration itself served as an adequate, rather than misleading, disclosure of total costs.

[5] The fact that other sales agents testified that they would tell plan participants if they asked does not amount to a disclosure. The evidence shows that the trustee bank's 1.5% fee was on the trust agreement. (Exh. 24, Trust Agreement.) Thus, plan participants might not ask about fees, believing that to be the only one of significance. Truthful statements, such as the one about the 1.5% fee, can be misleading when someone omits to state a material fact without which the truthful statement, based on the circumstances, becomes misleading. *See* 17 C.F.R. § 240.10b-5 (in the context of Rule 10b-5).

disclosure. Omitting total costs is undisputably material.

Additionally, a showing of scienter is required in order to show a violation of section 10(b) and Rule 10b-5 of the Exchange Act and of section 17(a)(1) of the Securities Act. The Supreme Court has defined scienter in this context as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). In the Eleventh Circuit, scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (citation omitted); *see also SEC v. Southwest Coal and Energy Co.*, 624 F.2d 1312 (5th Cir. 1980). Mere negligence, however inexcusable, does not serve as scienter. *Id.* at 815. The facts discussed above also give rise to a question of fact regarding whether Defendants' omissions were merely a negligent failure to disclose cost breakdowns or whether they arose out of knowing misconduct or severe recklessness in failing to disclose plan costs. Accordingly, summary judgment is inappropriate with respect to the fraud counts.

**B.     Counts IV and V**

Under Section 15(a)(1) of the Exchange Act, a broker or dealer must register with the SEC before it can use the mails or any instrumentality of interstate commerce to effect any transaction

in the purchase or sale of a security.[6]  15 U.S.C. § 78o.  Section 3(a)(4)(A) of the Exchange Act defines "broker" as a person "engaged in the business of effectuating transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4).  Mutual fund shares, such as those at issue in this case, are securities.  *See Tcherepnin v. Knight*, 389 U.S. 332, 343 (1967) ("we have little doubt that such [mutual fund] shares are securities within the meaning of the Securities Exchange Act.").  Defendants, however, assert that they were marketing not mutual funds, but "trust relationships."  Defendants assert that their only functions, with respect to the mutual funds, were to market them as a "finder" and perform accounting and customer service.

"In determining whether a person has acted as a broker, several factors are considered. These factors include whether the person: 1) actively solicited investors; 2) advised investors as to the merits of an investment; 3) acted with a 'certain regularity of participation in securities transactions'; and 4) received commissions or transaction-based remuneration." *SEC v. Corporate Relations Group, Inc.*, No. 99-CV-1222, 2003 WL 25570113, at *17 (M.D. Fla. 2003) (citing *In re Kemprowski & the Cambridge Consulting Co.*, Exchange Act Release No. 34-35058, 1994 WL 684628, at *2 (Dec. 8, 1994)).  In this case, it is undisputed that Defendants actively solicited investors and received commissions or transaction-based remuneration.  Moreover, they regularly

---

[6] In its entirety, Section 15(a)(1) provides:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

participated in securities transactions, because the checks to purchase the mutual funds were sent to them and they sent out accounting statements.

The factor over which there is a dispute of fact is whether they advised investors as to the merits of an investment. There is some evidence that sales agents were trained in financial matters, and it is undisputed they distributed research on mutual funds to potential plan participants during sales meetings. On the other hand, at least one sales agent testified that they never advised clients about which mutual funds to select. Given this dispute of fact, and a lack of clarity regarding the relationship between the Corporate Defendants and the trustee banks that purchased the mutual funds, the Court finds that summary judgment is not appropriate on Count IV at this time.

With respect to Count V, "[f]or aiding and abetting liability under the federal securities laws, three elements must be established: (1) a primary or independent securities law violation committed by another party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; also conceptualized as scienter in aiding and abetting antifraud violations; and (3) that the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation. *SEC v. K.W. Brown and Co.*, 555 F.Supp.2d 1275, 1306 (S.D.Fla. 2007) (citing *Woods v. Barnett Bank*, 765 F.2d 1004, 1009 (11th Cir.1985)). Thus, without summary judgment on Count IV, summary judgment is inappropriate on Count V. It is, therefore:

**ORDERED AND ADJUDGED** that

1. Plaintiff's Corrected Motion for Summary Judgment **(D.E. No. 162)** is **DENIED**.

2.  Defendant's Motion for Summary Judgment **(D.E. No. 142)** is **DENIED**.

DONE AND ORDERED in Chambers at Miami, Florida, this 30th day of July, 2009.

```
                    _____
                    JOSE E. MARTINEZ
                    UNITED STATES DISTRICT JUDGE
```

Copies provided to:
Magistrate Judge Brown
All Counsel of Record