UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  07-22570-CIV-MARTINEZ-BROWN**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

U.S. PENSION TRUST CORP., U.S.
COLLEGE TRUST CORP., ILIANA
MACEIRAS, LEONARDO MACEIRAS JR.,
NILDO VERDEJA,

      Defendants.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Securities and Exchange Commission ("SEC" or "the Commission") filed this action

for injunctive and other relief asserting five causes of action against the various Defendants.

Count I charges all the Defendants with violating Section 17(a)(1) of the Securities Act of 1933,

15 U.S.C. § 77q(a) ("Securities Act").  Count II charges all Defendants with violating Sections

17(a)(2) and 17(a)(3) of the Securities Act.  Count III charges all Defendants with violating

Section 10(b) and Rule 10b-5 of the Securities Exchange Act ("Exchange Act").  Count IV

charges Defendants U.S. Pension Trust Corporation ("USPT") and U.S. College Trust

Coporation ("USCT") (collectively "Corporate Defendants" or "Companies") as primary

violators of Section 15(a)(1) of the Exchange Act.  Count V charges Defendants Iliana Maceiras,

Leonardo Maceiras, Jr., and Nildo Verdeja (collectively "Individual Defendants") with aiding

and abetting violations of Section 15(a)(1) of the Exchange Act.  Counts I-III are fraud claims.

Count IV is a claim that the Corporate Defendants acted as unregistered securities broker-dealers. Count V charges the Individual Defendants with aiding and abetting the Corporate Defendants in acting as unregistered broker-dealers.  This matter came before the Court for a bench trial that commenced on January 25, 2010 and concluded on January 29, 2010.

FINDINGS OF FACT[1]

1.  U.S. Pension Trust Corp. ("USPT") is a Florida corporation that has operated as a sales and marketing company since 1995.

2.  U.S. College Trust Corp. ("USCT") is a Florida corporation that has operated as a sales and marketing company since September 1997.

3.  Although they have different shareholders, USPT and USCT operate as the same company with the same employees and from the same offices. (Tr. 52).

4. The Companies' offices have always been located in Miami-Dade County, Florida.

5.  The Companies offered investment plans (Tr. 57) from 1995 until 2009, and they raised more than $250 million from these efforts. (Tr. 349, 767).

6.  The Companies' investment plans give investors the opportunity to invest in United States mutual funds. (Tr. 159).

7.  The Companies never registered with the Commission in any capacity and never registered their products with any government agency. (Tr. 188).

8.   Iliana Maceiras, Leonardo Maceiras, Jr., and Nildo Verdeja are USPT's officers, owners, and principals.  (Tr. 51).

---

[1]   To the extent that the Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be considered as such.

9. The Individual Defendants run the Companies and are responsible for all the Companies' business decisions. (Tr. 52, 55).

10.  The Individual Defendants were all responsible for reviewing the Companies' marketing materials, and they approved English and Spanish versions of those materials. (Tr. 315-16).

11. The Individual Defendants are United States citizens, and have been residents of Miami-Dade County, Florida during the entire time they worked for the Companies. (Tr. 619).

12.  Maceiras has been working for USPT since its inception in 1995.  (Tr. 519).

13.  Maceiras was the Vice President of Operations from 1995 until 2001, and has been President from 2001 until present.  Maceiras has also been an officer of USCT since its inception in 1998.  (Tr. 501).

14.  As President, Maceiras is the highest ranking employee of USPT.

15.  At all times that she worked for the Companies, Maceiras supervised the Companies' operations and oversaw most of the Companies' employees (Tr. 147, 502).

16.  Verdeja began as Vice President of Marketing for USPT from 1997 or 1998 until 2002, and has been the Executive Vice President of USPT from 2002 until now.

17.  Despite the title change, Verdeja's job has always been the same. (Tr. 139).

18.  Verdeja is also a USPT shareholder and owns 14 percent of the Company. (Tr. 138-39).

19.  During his entire tenure with the Companies, Verdeja had primary responsibility for the Companies' sales and marketing efforts. (Tr. 139-40, 145-46).

20.  Mr. Maceiras, Jr. has worked for USPT since its inception in 1995. (Tr. 150, 381,

519-20).

21.  Mr. Maceiras Jr. held the same positions with USPT and USCT. (Tr. 382).

22.  Mr. Maceiras Jr. was the Assistant Vice President of Marketing from 1995 until 2002 (Tr. 150), and has been the Vice President of Marketing since 2002 (Tr. 150).

23.  From 1998 to 2007, Maceiras was paid a total of $967,164 in salary.  Other than her 1996 and 1997 salaries, there is no evidence that she received any other money from the Corporate Defendants or the sale of the securities in question.  Because her salary records show that her salary consistently increased through the 1990s into the early 2000s, the Court finds that she received no more than her 1998 $63,100 salary in 1996 and 1997.  (Ex. ZZZ).

24.  From 1997 to 2007, Mr. Maceiras Jr. was paid a total of $633,834 in salary.  Other than his 1996 salary, there is no evidence that he received any other money from the Corporate Defendants or the sale of the securities in question.  Because his salary consistently increased into the early 2000s, the Court finds that he made no more than his 1997 $40,733 salary in 1996. (Ex. ZZZ).

25.  From 1997 to 2006, Verdeja was paid a total of $839,575 in salary.  Other than his 1996 and 2007 salaries, there is no evidence that he received any other money from the Corporate Defendants or the sale of the securities in question.  For the same reasons listed above for the other Individual Defendants, the Court finds that Verdeja made no more than $56,415 in salary in 1996.  The Court also finds that, based upon his relatively stable salary in the late 2000s, he made more nor than $97,525 in 2007.  (Ex. ZZZ).

**I. The Investment Plans**

26.  The Companies offered investment plans (Tr. 57).  Specifically, the Companies

offered an "Executive Plan," created prior to 1997; a "Corporate Plan," created in 2002; and a "College Plan," created in or about 1998 (collectively, the "Investment Plans").

27.  The Companies' Investment Plans included (1) mutual funds; (2) trusts; and (3) in some instances, insurance. (Tr. 159:5-7).

28.  The investment plans the Companies offered are the Companies' own trust products. (Ex. 26); (Tr. 275); (Tr. 1014).

29.  The Companies offered the investment plans to new investors until January 2008, when Regions Bank stopped accepting contributions from new UPST and USCT investors, and continued accepting contributions from existing investors until August 31, 2009. (Tr. 261:15-20).

30.  The Companies continue to service all existing investors.

31. The Companies sold their investment plans to approximately 14,000 investors (Tr. 646).

32.  Investors in the Companies' investment plans had the option of making their contributions through annual payments or lump sum payments. (Tr. 58).

33.  Most investors chose to make annual payments. (Tr. 58).

34.  For investors making annual payments, the minimum investment was $1,000 a year for ten years, for a total of a $10,000 contribution. (Tr. 58).  For investors making a lump sum payment, the minimum investment was $5,000. (Tr. 58).

35. There is no insurance component for the investment plans if the investor makes a lump sum payment. (Tr. 271).

36.  There is a no-cancellation period under the investment plans. (Tr. 58). Investors who make annual contributions cannot cancel for five years, and investors making single

contributions cannot cancel for the first three years. (Tr. 58).

37. It is undisputed that the Companies' investment plans included mutual funds. (Tr. 59-60, 159, 160, 166).

38. In their marketing materials, the Companies touted their investment plans as an opportunity for investors who were predominately located in Latin America (Tr. 316) to buy and trade U.S. mutual funds. (Ex. 2, at -0006; Ex. 4, at -00088; Ex. 8, at -00161).

39. The Companies offered a menu of mutual funds, which included United States mutual funds from companies such as Fidelity Investments, JP Morgan Fleming, Janus, and Vanguard, and Evergreen. (Tr. 160, 166; Ex. 2-3, Ex. 4, at -94, Ex. 5).

40. The Companies' investors could only invest in funds on the Companies' mutual fund menu. (Tr. 165).

41. As of August 2009, when the Companies stopped accepting investor contributions, the investment plans included 12 mutual funds. (Tr. 160).

42. The Companies' investment plans also included a trust. (Tr. 159:5-7).

43. The trustee's role was strictly limited to being the trustee for the USPT investors. (Lombardo Dep. 59).

44. The trustees charged the Companies' investors a 1.5% fee, and then split this fee with the Companies.

45. Three United States banks have served as the trustee of the trusts associated with the Companies' Plans: (1) First Union served from 1995 until it resigned in 2001 (Tr. 258-59); (2) Union Planters served as trustee from 2001 until 2004 (Tr. 258); and (3) Regions Bank has served as the trustee from 2004 until present (Tr. 259).

46. In 2007, Regions Bank advised the Companies it wanted to resign as trustee (Tr. 261).

47. Regions Bank stopped accepting contributions from new UPST and USCT investors in January 2008, and from existing USPT and USCT investors on August 31, 2009. (Tr. 261).

48. The Companies have been searching for a new trustee since they learned Regions wanted to resign in 2007. (Tr. 261).

49. Some of the Companies' Investment Plans included a mandatory insurance component, and some did not. (Tr. 270).

50. Since 2001, U.S. Penn Insurance Limited ("U.S. Penn") has provided the insurance offered through the Companies' plans. (Tr. 270-71).

51. Maceiras and Verdeja own U.S. Penn and serve as its directors, and Verdeja runs U.S. Penn. (Tr. 271-72).

**II. Solicitation of Investors**

52. It is undisputed that the Corporate Defendant Companies actively solicited investors through their sales agents until the Companies stopped accepting new investors in January 2008.

53. The Companies have always used regional directors and sales agents to market their investment plans. (Tr. 271).

54. The Companies operated with a small number of employees (Tr. 137, 520), but contracted with about 2,000 sales agents to sell the Companies' investment plans (Tr. 21-25).

55. The Companies entered into contracts with the sales agents. (Ex. 26).

56. In the sales agent contract, the Companies appointed each sales agent as "the Company's representative for the purposes of soliciting applications for the pension plan

programs and other financial products developed by the Company." (Ex. 26, Tr. 275).

57. According to Verdeja, the sales agent contract (Ex. 26) accurately stated the sales agents' role. (Tr. 274).

58. Verdeja testified that the "pension plan programs and other financial products" referenced in the sales agent contract are the Companies' Plans and the mutual funds, trusts, and insurance included in those plans. (Tr. 275).

59. The Companies' sales agents do not work for the trustee banks (Tr. 1014).

60. The Companies hired four to five regional directors in each country where they did business to supervise the sales agents, and USPT paid some of the regional directors a salary (Tr. 644).

61. The Companies supervised the regional directors, who reported directly to the Companies and the Individual Defendants (Tr. 385, 644).

62. Maceiras Jr. handled the Companies' interactions with the regional directors (Tr. 384-85).

63. USPT provided the regional directors and sales agents with business cards that read "U.S. Pension Trust" and showed the Companies' United States address (Tr. 374-75).

64. The Companies trained the regional directors and sales agents, and some of the training took place in the United States. (Tr. 276, 540-41).

65. Verdeja was responsible for recruiting, training, and supporting sales agents (Tr. 140) and personally trained the sales agents from 1998 until 2003 (Tr. 276).

66. From 1997 until now, Maceiras Jr. travelled to Latin America to assist with training sales agents and regional directors (Tr. 146).

-8-

67. Regional directors attended at least two or three USPT training sessions per year, led by the Individual Defendants.

68. Some of the Companies' sales force worked out of the Companies' Miami, Florida office. Alfredo Tognetti, a USPT Regional Director from 1996 until the Companies stopped soliciting new investors on December 31, 2007 (Tr. 474-75), worked out of the Companies' office from 1999 until 2004 or 2005. (Tr. 476). During that time, Mr. Tognetti, who was one of the Companies' top producers (Tr. 272), sold USPT's investment plans and supported the sales agents. (Tr. 476).

69. Mr. Tognetti sold an investment plan to USPT investor Sara Plana Huerta. (Huerta Dep. at 12-15, 16-18, 20-21, 24, 27). In doing so, Mr. Tognetti met with Ms. Huerta at USPT's Florida office.

70. The only marketing documents the Companies distributed to potential investors were marketing brochures and folders (Ex. 2-9), trust agreements (Ex. 17, 19), fact sheets about the mutual funds offered through the Investment Plans (Ex. 6, at -145-157, Ex. 33), trust summaries (Ex. 18, 20, 21), and illustrations² (Ex. 11-16). (Tr. 348).

71. The Companies created marketing materials for the Investment Plans (Tr. 64), printed them in the United States, and distributed them to potential investors through the Companies' sales agents. (Tr. 64).

72. The Individual Defendants were all responsible for reviewing the Companies' marketing materials (Tr. 315).

---

²One of these illustrations is titled a "Benefits" document. (Ex. 11). At trial, it is sometimes referred to as the Benefits document (Tr. 132:24-133:17), and sometimes as an illustration (Tr. 650:21-651:22).

73. Maceiras admitted that during her entire time working for the Companies, from 1995 until now, she read all the Companies' marketing materials, knew what they said, and knew what documents the Companies were distributing. (Tr. 523).

74. Maceiras proofread all the Companies' marketing materials. (Tr. 649).

75. When Verdeja joined USPT in 1998, he reviewed all the documents the Companies were distributing to the potential investors. (Tr. 336-37).

76. Verdeja used the Companies' marketing materials to train sales agents from 1997 until 2003. (Tr. 336).

77. Some of the marketing materials the Companies distributed appeared in English and Spanish, and the Individual Defendants were all responsible for having the marketing materials translated between English and Spanish. (Tr. 316).

78. The Individual Defendants all reviewed and approved all the marketing materials in both English and Spanish. (Tr. 316).

79. The Individual Defendants discussed the Companies' marketing brochures before the Companies used them (Tr. 401).

80. Union Planters and Regions did not have any role in creating the marketing materials, brochures or disclosures that were used to market the USPT products. (Lombardo Dep. 45-46).

81.  Between 1995 until January 2008 (Tr. 199, 653) the Companies created and distributed various sales brochures and marketing kits to potential investors through their sales agents (Tr. 64).

82. The Defendants distributed an Executive Plan Marketing Kit (Ex. 2) from 1995 until 2001 (Tr. 653:21-24), which included the Executive Plan brochure (Ex. 3). Verdeja reviewed

these materials before they were distributed, knowing they would be distributed to potential

investors. (Tr. 188, 194). In 2001, the Individual Defendants revised the marketing kit (Tr. 193)

to add more detail about the mutual funds the plan offered (Tr. 655), and distributed this revised

version until 2005 (Tr. 656).

83. The Companies distributed an Executive Plan brochure (Ex. 4) from 2003 or 2004

until mid-2006 (Tr. 198-99).  The Individual Defendants created this brochure and decided its

content (Tr. 199-200).

84. The Companies distributed a Corporate Plan Brochure (Ex. 6) to potential investors

through sales agents, beginning in 2003 for about a year to eighteen months (Tr. 163). The

Individual Defendants created this brochure, and reviewed and approved it before the Companies

distributed it to potential investors. (Tr. 163-64).

85. From 1998 until 2008, the Companies distributed a College Plan brochure and

marketing kit (Ex 7); (Tr. 318). The Individual Defendants reviewed the College Plan this (Tr.

318), and Verdeja approved it for distribution. (Tr. 318).

86. From 2002 until 2003, the Companies distributed a brochure for the College Plan (Ex.

8) (Tr. 319:22-320:2), which the Individual Defendants created. (Tr. 320:19-21).

87. From 1998 until 2005, the Companies distributed a College Plan brochure (Ex. 9) (Tr.

320, 323) (Ex. 9, 1998/99-2005 College Plan Brochure), which the Individual Defendants

drafted. (Tr. 323).

88. In the marketing materials discussed above, the Companies told potential investors

the Companies were: "marketing different investment and pension products" (Ex. 2 at -

10); "proving high quality financial products" (Ex. 4 at -88); and "provid[ing] sophisticated

-11-

financial products." *Id*.

89. The Companies' marketing materials also told potential investors that the "investment choices" it offered were the "very same mutual funds used in retirement programs throughout the United States." (Ex. 2-5).

90. It is undisputed that the investment plans offered mutual funds, trusts, and sometimes insurance. (Tr. 159.  However, after the Defendants learned about the Commission's investigation (Tr. 918), they revised their Executive Plan brochure to change the description of their business to providing "quality trust products." (Ex. 5 at -0002). The Defendants distributed this brochure from mid-2006 until January 2008 (Ex.5) (Tr. 199).

91. The Companies' brochures touted the mutual funds the Companies offered (Ex. 2 at -06, Ex. 4 at -88 & 94, Ex. 5 at -0008, Ex. 7 at -164, Ex. 8 at -161, Ex. 9 at -153), and identified mutual funds as the "main investment vehicle" of the investment plans. (Ex. 2 at -06), (Ex. at -94), (Ex. 5 at -0008).

92. The brochures highlighted the mutual funds and stated, among other things:

"[Fidelity Funds have] an impressive track record showing that their basic growth was fueled by capital gains…." (Ex. 2 at -6).

"With our experience and that of our Trust partners, we have selected an outstanding portfolio of investment instruments from credible financial institutions such as: Fidelity Investments, JP Morgan Flemming and others. We have diversified our investment options to include a broad range of asset classes, from equities to bonds to alternative investments (hedge funds)." (Ex. 4 at -88).

"The [Fidelity Investments and JP Morgan Fleming" mutual fund families

contain funds whose primary objective is to increase the value of the fund's share over the long

term by investing in stocks of companies with above-average growth potential," and that

"[investors] may also participate in mutual funds that exclusively invest in stocks of US

companies or that of Europe. Other funds offer a more conservative approach and invest in

government and corporate bonds in the US, while our global bond fund invests in overseas

instruments. The equity funds selected are chosen for their potential to generate growth through

capital gains." (Ex 5 at -008).

93. The brochures discussed above are the only brochures the Companies distributed

to potential investors. (Tr. 326-27).

94. The Companies distributed four trust summaries over time: (1) a trust summary when

First Union was the trustee, from 1995 until 2001 (Ex. 18; Tr. 258-59, 329, 657); (2) an English

version of the trust summary when Union Planters was the trustee, from some time in 2001 until

some time in 2004 (Ex. 20; Tr. 329); (3) a Spanish translation of the Union Planters Trust

Summary (Ex. 21; Tr. 329-30); and (4) a substantially similar trust summary they continued to

use when Regions Bank was trustee. Ex. 20 (Tr. 328).

95. The Companies distributed three trust agreements over time: (1) a First Union trust

agreement, used when First Union was trustee from 1995 until 2001 (Ex. 17) (Tr. 328, 657); (2) a

Union Planters trust agreement, used when Union Planters was the trustee from 2001 until 2004

(Ex. 19) (Tr. 259, 328); and (3) a Regions Bank trust agreement, used when Regions Bank was

the trustee. (Ex. 92, Investor file).

96. From at least 1998 until the present (Tr. 51, 172), the Companies have distributed

information about the mutual funds they offer to potential investors (Tr. 167-68) ( Ex. 5 at USPT

17-28, Ex. 6 at USPT 147-USPT 157, Ex. 33). These documents are referred to as "mutual fund fact sheets," and the Companies distributed them with all of their investment plans (172).

97. The mutual fund fact sheets included information about each mutual fund's Morningstar rating, the types of companies and top ten industries the mutual fund invested in, a comparison between investment risk and return, and historical information about the mutual funds. (Tr. 168-70; Exs. 33 and 6 at USPT 147-157).

98. Leonardo Maceiras Jr. created the mutual fund fact sheets (Tr. 168) and Verdeja reviewed and approved them for distribution to sales agents and potential investors. (Tr. 172, 176).

99. Maceiras Jr. also monitored the performance of the mutual funds offered through the Companies' investment plans (Tr. 152-53).

100. The Companies also translated the mutual fund fact sheets into Spanish (Tr. 168).

101. From 1995 until 2008, the Companies distributed various versions of a document they refer to as an "illustration."  In 1998, the Individual Defendants amended the Companies' illustration and made a collective decision to continue using them. (Tr. 650).

102. The first illustration is titled "Benefits," and the Companies distributed it from 1995 until 1999 or 2000. (Ex. 11; Tr. 335, 650-51).

103. The Companies continued revising and distributing the illustrations for the next 10 years, until January 2008: (1) Version 1.6 (Ex. 12), distributed in 2001 (Tr. 343); (2) Version 6.2 (Ex. 13), distributed to potential investors from 2002 through 2006 (Tr. 341); (3) Version 7.0 (Ex. 14), distributed for some time in 2005 through 2006 (Ex. 14, Tr. 342); (4) Version 7.04 (Ex. 15), distributed after version 7.0 of the illustration (Ex. 14), some time between 2005 and May

2006. (Ex. 14, Tr. 342); and (5) Version 8.1 (Ex 16), distributed from May 2006 until January 2008 (Ex. 16, Tr. 342).

104. It is undisputed that the Companies solicited investors directly through the Internet. Specifically, the Companies maintained a website that contained the same information as the Companies' marketing brochures.

105. The website, located, at www.uspensiontrust.com, was revised over the years. (Exs. 25, 128).

106. The Companies' website permitted investors to view their annual statements (403) the Companies used the website to process credit card payments for investors' contributions. (Ex. 26), (Tr. 403).

107. The website did not include the illustrations. (Tr. 402-03).

108. Maceiras Jr. and Verdeja created the Companies' website and changed it every time the Companies changed their brochures, because the brochure and website contained the same information. (Tr. 401-02).

109. Verdeja and Maceiras Jr. contributed to, reviewed, and approved the content of the Companies' website (Tr. 144, 149), and Maceiras Jr. oversaw the Companies' websites (Tr. 384).

110. In 2001 and 2002, USPT advertised its investment plans in three separate issues of *Nexos* magazine, a Spanish-language publication owned by American Airlines and available to passengers on American Airlines flights between the United States and Latin America.  (Ex. 22-24), (Tr. 521).  The Individual Defendants reviewed and approved the American Airlines *Nexos* advertisements (Tr. 522-23), which described the Companies to potential investors as "offer[ing] diverse investment and retirement products." (Ex. 22-24).

111. The *Nexos* advertisements told potential investors they "can expect from [the Companies] security and confidentiality with investments in world renowned mutual funds, protected by a trust with one of the largest banks in the United States." (Ex. 22-24).

112. The *Nexos* advertisements also told potential investors to "Trust the stability and experience that qualifies us as a solid and professional company to plan your financial future." (Ex. 22-24).

113. The Companies also held hundreds of sales events with potential investors. (Tr. 1020-22).

## III. Enrollment

114. Iliana Maceiras has been overseeing the process for enrollment and operations since late 1995 (Tr. 518), which is when USPT was incorporated (Tr. 518).

115. In a visa application package Iliana Maceiras signed on behalf of USPT, under penalty of perjury in 2000 (Ex 32), USPT and Iliana Maceiras stated that their sales representatives were critical to USPT and were highly specialized investment professionals. Maceiras and USPT represented to the INS that:

> Our central concern and objective is for our investors to remain confident that their representative is ***thoroughly trained to devise the best investment option available to suit the individual situation/lifestyle of the investor***. Investment strategies can seem complicated when making the initial decision to create an individual plan. Each individual investor has specific goals which adjust to market conditions and personal needs. ***Our focus on understanding diverse clients' needs helps us in assisting them to aim each portfolio in the preferred direction.***

(Ex. 32) (Emphasis added).

116. The Companies' marketing brochures touted "representatives with financial

expertise" as one of the benefits the Executive Plan provided and claimed they had "representatives with vast knowledge in investment and retirement products." (Ex. 2-5).

117. USPT Regional Director Jose Juliao testified that the Companies' sales agents provide investors' financial planning. (Tr. 901).

118. The Companies provided the sales agents with training software to assist them in their sales efforts. (Tr. 143-44; Ex. 41-51).

119. Verdeja and Maceiras Jr. created and reviewed all of the training software (Ex. 41-5) (Tr. 141, 150, 384, 399-400).

120. Verdeja testified that the training software and the marketing materials were the comprehensive presentation to potential investors. (Tr. 348).

121. On the training software was a so-called "risk questionnaire" (Ex. 41-51, Tr. 487-88), which the Companies trained sales agents to use in their sales meetings with potential investors (Tr. 488, 490).

122. The risk questionnaire was a way to try and ascertain how much risk a potential investor was willing to undergo in his investment. (Ex. 41-51, Tr. 487-88).

123. Using the risk questionnaire, sales agents asked potential investors the questions on the risk questionnaire, assigned certain points to the answers, and that gave a score which the sales agents could then translate to a high risk, low risk, or medium risk tolerance level. (Tr. 487-88).

124. Tognetti, testified that "Depend[ing] on the answer of the questionnaire we recommend that particular mutual funds." (Tr. 490).

125. From at least 2002 until now, the Companies have provided sales agents with a

diagram showing specific mutual funds arranged from the lowest risk to highest risk. (Ex. 52); (Tr. 488-90).

126. The Companies trained their sales force to use this diagram. (Tr. 490).

127. Tognetti explained that they would use the answers to the risk questionnaire to show mutual funds on the diagram - "[Y]ou can invest in this mutual fund because you are a low tolerance risk customer or you are a high risk tolerance customer." (Tr. 490).

128. The Companies also trained their sales agents to use a document that shows how to tailor different mutual fund portfolio compositions for different risk levels (Ex 53, Tr. 311-12, 494).

129. The pie chart shows different portfolio compositions arranged from conservative to aggressive, depending on the investor's answers to the risk tolerance questionnaire. (Ex 53, 494-95).

130. If the investor selected mutual funds from the diagram (Ex. 52) with different risk levels, the sales agent was to show the investor the pie chart (Ex. 53).

131. The pie chart showed investors their potential returns depending on what percentage of their investment went to low risk mutual funds versus high risk mutual funds. (Ex. 53, Tr. 495).

132. The Companies provided their sales agents with a "USPT Pension Review" document (Ex. 54) that described the mutual funds the Companies offered.

133. The Companies also provided fact sheets to the sales agents that explained the mutual funds the Companies offered (Ex. 33, 120). The purpose of these mutual fund fact sheets was to educate the sales agents so they could, in turn, inform the investors in making their mutual

fund selections. (Tr. 468-69). The mutual fund fact sheets included information about each mutual fund's Morningstar rating, the types of companies and top ten industries the mutual fund invested in, a comparison between investment risk and return, and historical information about the mutual funds. (Tr. 168-70; Ex. 6 at USPT 147-157).

134. Additionally, USPT Regional Director Juliao testified he printed research from Bloomberg, the Wall Street Journal, and other financial sites about the mutual funds the Companies offered and showed that to the investor to help them decide which funds to invest in, and he trained his sales agents to do the same. (Tr. 904).

135. The Companies' sales agents gave potential investors the documents for enrolling in the Investment Plans (Tr. 908), and, upon completion, the sales agents mailed these forms and investors' contribution checks to the Companies in Miami, Florida. (Tr. 503:13-16, 907:24-908:7).

136. All investor contributions had to be in US Dollars. (Tr. 503), and the sales agents would convert investors' contributions from foreign currency to US Dollars (Tr. 505) using US bank accounts the Companies helped the sales agents open. (Tr. 505). Since approximately 2000, the Companies have also processed investors' contributions via credit cards. (Tr. 506, 624).

137. The Companies created and maintained computer files on each investor, including how much the investor contributed, how that contribution was spent, and how much went to commission, investments, and insurance. (Ex. 55, Tr. 510-11). The Companies did not share this information unless the investor requested it. (Tr. 511-12).

138. The Companies also generated what the Companies call a "batch header" and "transmittals," which the Companies sent to the trustee bank. (Tr. 503, 507-08).

139. The Companies' transmittal form (Ex 56 at 2; Tr. 507, 509) told the trustee bank how much of the investor's contribution should be invested in mutual funds, and which funds (Ex 56 at 2; Tr. 509).

140. The batch header (Ex. 56 at 1, Tr. 507) is the Companies' document, and the Companies used it all times until the trustee bank stopped accepting contributions in September 2009 (506-07).

141. Using the batch headers, the Companies told the trustee bank how to allocate the investor's contribution, which was how much to invest in mutual funds, and which funds, and how much to return to USPT (Ex 56 at 1, Tr: 508-09).

142. The Companies did not show the batch headers and transmittal forms to investors. (Tr. 510).

143. The trustee banks followed the Companies' instructions on the batch header and allocated investors' contributions accordingly. (Tr. 509, 1023-24).

144. Pursuant to the batch header, the trustee bank placed the Companies' portion of the investor's contribution into a bank account for the Companies ("Contribution Account"), within 24 to 48 hours. (Tr. 515-16).

145. Maceiras was a signatory on the Companies' Contribution Account (Tr. 516), which she used to pay the Company's operating account and US Penn Insurance (Tr. 517-18), an insurance company Maceiras and Verdeja owned.

146. Maceiras is also the signatory on the Companies' operating account (Tr. 501-02), which is used to the company bills, the commissions, and the day-to-day operations. (Tr. 501-02).

147. Because Maceiras has overseen the enrollment process since 1995, she saw all the documents used in the enrollment process and always knew what they said. (Tr. 523-24).

148. The Corporate Defendants continued to service investors after they purchased securities.  When investors contributing under the ten-year annual payment plan sent the Companies their contributions in the second through tenth years of the investment periods, the Companies processed these contributions and sent the batch header and transmittal to the trustee bank, but the trustee bank did not then take over the accounts. (Tr. 623).

149. If investors wanted to make changes to the funds in which their contributions are being invested or cancel their investment, they contacted the sales agents or the Defendants' office directly and completed a USPT form. (Tr. 623-24). The regional directors sent the change forms to USPT by mail. (Tr. 906).

150. It is undisputed that the Companies also provided account access to their investors through the Companies' website, and prepared and mailed investors invoices and annual statements, some to U.S. addresses.

151. The invoices (Ex. 96) solicited investors' next annual contribution under the investment plans.

152. After processing the investors' contributions, the Companies prepared and sent their investors certificates, which told investors their contributions were allocated to specific mutual funds. (Ex. 161, at USPT-supp-09-1035, Tr. 512-15).

IV.  Misleading Statements and Omissions

153. The certificates did not tell investors that only a portion of their contribution went to the mutual fund investments or how much the Companies deducted from their contributions and

for what purpose. (Ex. 161, at USPT-supp-09-1035; Tr. 513).

154. From the Companies' inception until June 2006, the Defendants failed to disclose the exorbitant amounts they took from investors' contributions. Among other things, they took:

70% to 85% from investors' first year contributions.

22% to 35% from investors' second through fifth year contributions.

Up to 23% from investors' sixth through tenth year contributions.

12% to 18% from single investment payments. (Tr. 62).

155. It is undisputed that the Individual Defendants knew the commissions and fees during their entire time working for the Companies. (Tr. 131, 523-24, 650).

156. From 1995 until May 2006, the Companies disclosed the commissions, fees, profits, and costs to investors and potential investors only if asked. (Tr. 357).

157. Even after May 2006, the Companies continued to make false and misleading statements about investors' returns and losses, and failed to disclose sales agents' commissions. (Ex. 16).

158. Commission Senior Regional Accountant Fernando Torres testified (Tr. 761) that based on his review of the Companies' documents, including: the Companies general ledgers from 1996 through 2009; the Companies' tax returns through 2008; and the Companies' databases which showed the contributions received and the allocations of those contributions to commissions, fees, and investments (Tr. 763:4-23), the total USPT investor contributions were $257.9 million and USCT investor contributions were $9 million, for a total of about $266.9 million (Tr. 767).

159. Torres testified that based on his review of these same USPT and USCT documents,

from 1996 until March 2009, USPT's total gross income is $76.7 million, and for USCT it was $2.8 million, for a total of $79.5 million. (Tr. 777-78).

160. The Companies have three sources of revenue: (1) investor contributions; (2) half of the trustee bank's fee; and (3) half of a fee Fidelity pays the trustee bank. (Tr. 349)  Therefore, the $79.5 million reflects revenue from these three sources.

161. Torres testified that $17 million of the $79.5 million figure was bank fees and Fidelity fees (Tr. 778), leaving approximately $62.6 million from investors' contributions.

162. The Companies took money from annual investors' contributions for the first ten years of the investment period. (Tr. 61).

163. Investors making annual contributions did not break even until about the sixth year of the investment period. (Tr. 345).

164.  As an illustration, in 2001, if an annual investor contributed the minimum $1,000 each year for ten years (Tr. 58), the Companies would take about $700 from the first contribution (Tr. 60), $300 to $390 from each second through fifth year contribution (Tr. 60), and about $92 from each sixth through fifth year contributions. So, out of the total $10,000 investment, the Companies took $2,360 to $2,720.

165. In 2002, the Companies increased the amounts they took from investors' contributions. (Tr. 61). The Companies then took 85 percent from the first year contribution, 22 percent from the second year contribution, and 23 percent from the third through tenth year contributions.

166. Therefore, for an investor making the minimum annual contributions of $1,000 per year for ten years, the Companies took $850 from the first year contribution (Tr. 61), $220 in

the second year (*Id*. at 61:11-18), and about $230 in the third through tenth years of the plan. Thus, out of a total $10,000 investment, the Companies took $2,910.

167. Maceiras Jr. notified the regional directors in writing when the cost and fee amounts for the Companies' plans changed (400-01).

168. For lump sum investors, the Companies have always taken twelve percent of the contribution. Therefore, if an investor contributed $1,000, the Companies took about $120 from the contribution.

169. The Companies used the funds they deducted from investors' contributions to pay their sales agents commissions based on the sales transactions (Tr. 131), and to pay themselves profits and pay insurance fees (Tr. 130).

170. From 1995 until 2001, the Companies paid sales agents a 45 to 50% commission on the first year annual contribution. (Tr. 132). From 2002 until now, the Companies have paid sales agents a 70% commission on the first year annual contribution. (Tr. 132).

171. For investors making annual payments, the Companies paid sales agents a 6% commission on every contribution to every investment plan for the second year contribution, and continued paying sales agents a 6% commission on every contribution to the Executive Plan in years 3 through 10 (Tr. 644-45).

172. Verdeja learned the commissions and fees the Companies deducted from investors' contributions in 1997 or 1998. (Tr. 131).

173. Maceiras always knew how investors' contributions were spent because she oversaw the enrollment process and the batch headers the Companies created telling the trustee banks how to allocate investors' contributions. (Tr. 523-24).

174. Maceiras Jr., Verdeja and Maceiras always knew how investors' contributions were spent because beginning in about 1997 or 1998, they chose to address this issue using illustrations (Tr. 650). As discussed below, these illustrations did not disclose how investors' contributions were spent.

175.  Leonardo Maceiras Sr. was USPT's president from 1995 until Maceiras replaced him as President in 2002 (Tr. 518-19), and CEO from 1995 until 2005. (Tr. 519). In 2001, during the time he was USPT's President and CEO, Mr. Maceiras Sr. admitted that USPT would never reveal agents' commissions to investors because investors would find them "excessive." (Maceiras Sr. Dep. 66-67).

176. Leonardo Maceiras Sr. admitted the Companies did not reveal the commissions because had they been revealed to the investor, then the investor might have a serious problem with it and it would make it very difficult for USPT's agents to sell the investment plans. (Maceiras Sr. Dep. 66-67).

177. The Companies' marketing materials did not disclose the commissions, fees, profits, and costs to potential investors. (Ex. 2-9, 17-21, Tr. 327).

178. Additionally, the Companies made misleading statements about investors' contributions in the marketing brochures and folders.  The 1995-2003 Executive Plan Marketing Kit told potential investors that "The Executive Plan provides ongoing effective investment fund growth." (Ex. 2 at -6). In truth, investors lost money for the first five years of the investment period (Tr. 345) because of the amounts the Companies deducted from investors' contributions.

179. The Companies' marketing brochure told potential investors that "[t]he contributions are placed in a specific mutual fund" (Ex 7 at -164, Ex. 8, at -160, Ex. 9 at -153) and that the

trustee bank invested the contributions in mutual funds (Ex 8 at -160, Ex. 9 at -153).  In truth, the

Companies deducted exorbitant costs from the contributions and only a small portion of the

investors' contribution was invested in mutual funds.

180. Additionally, until May 2006, the Companies' marketing materials only disclosed

a $40 to $65 fee and a 1.5% administrative fee. (Tr. 379). They did not disclose the

additional far larger amounts of money the Defendants were taking from investors' contributions.

181. Further, the trust summary the Companies distributed until 2001 told potential

investors their contributions would "be allocated … to pay insurance premiums and for

investments in the mutual funds" (Ex. 17).  It did not disclose that in the first five years of the

investment period alone, the Companies took 30% to 70% of the investor's contributions and

additional amounts in years six through ten of the investment period. (Tr. 60).

182. From 2002 until at least January 2008, the Defendants distributed an English

version of the trust summary that told investors their contributions would be allocated for

insurance premiums, *fee*, and mutual fund investments. (Ex. 161 at -1018, Ex. 162 at -1044)

(emphasis added).  At least one of the trust summaries said "fees" instead of "fee," (Ex. 163), but

none disclosed what the fees were or that the Companies were taking large proportions of

investors' contributions.

183. Nowhere in the 2002 to 2008 trust summary did the Defendants disclose their

deductions of up to 85%.  Nor was there any explanation of "fee" or "fees."  (Ex. 20).

184. The Companies' investors were located primarily in Latin America and most spoke

Spanish as a primary language. (Tr. 316).

185. However, the Spanish version of the 2002 to 2008 trust summary (Ex. 21) told

potential investors even less than the English version (Ex. 20) because it omitted any mention of a fee whatsoever. (Ex. 21)  Specifically, the Spanish version told potential investors only that their contributions would go to pay "insurance premiums and mutual fund investments." (Ex. 21).

186.  As for the trust agreements, these stated that "U.S. Pension Trust or its affiliates *may* be paid fees by this trust, or the funds paid by the Grantor to the Trustee, for insurance placement, advisory, and other services provided to the Trustee or Grantor." (Ex. 19) (emphasis added).  In reality, the Defendants *always* took commissions and fees from the contributions investors paid to the trustee.

187.  As discussed above, until May 2006, the Companies distributed illustrations they argued disclosed the amounts the Companies were taking from investors' contributions. (Ex. 11-15). None of the illustrations the Companies distributed up to May 2006 gave potential investors a complete picture of how their investment contributions were being spent. (Ex 11-15).

188. The Individual Defendants collectively amended and decided to use the illustrations. (Tr. 650).

189. The early illustration (Ex. 11) only shows the projected financial benefits of the Investment Plan beginning more than a decade after the investor made his contribution. (Ex. 11).

190.  From 2002 until approximately January 2008, the illustrations included graphs purporting to show potential investors the projected growth of their investment. (Ex. 12-16). These graphs, which until approximately 2006 were labeled "Watch Your Money Grow" or "The Growth Of Your Investment," (Ex. 12-15) falsely told investors they would accumulate more money than they would contribute from the beginning of the investment period.  The illustrations

told potential investors their projected returns were "based on the performance of the mutual funds and the clients' contributions." (Ex. 12-16). They did not disclose that investors would not break even until approximately year 6 or 7 due to the high commissions, fees, and profits the Defendants took from investors' contributions. (Ex. 12-16).

191. The Companies continued using the false graphs in their illustrations every year, even after they learned about the Commission's investigation and revised their illustration in May 2006 (Ex. 16).

192.  Until May 2006, none of the illustrations told potential investors the Companies took 12% from every lump sum contribution and between 70 to 85% of every initial annual contribution, 22% to 39% of every third through fifth year contribution, and about 10% to 23% of every sixth through tenth year contribution. (Ex. 11-15).  In May 2006, the Companies revised their illustration for a final time after learning about the Commission's investigation. (Tr. 918).

193. Verdeja admitted that this May 2006 illustration, Version 8.1, is the only document the Companies distributed that disclosed how the Defendants spent the investors' contributions. (Tr. 135).

194. The Companies did not distribute the May 2006 illustration, Version 8.1, to existing investors of the Companies unless the investor visited the Companies' office in Florida or sent the Companies a renewal contribution. (Tr. 620-21).

195. None of the illustrations, including the May 2006 illustration, disclosed that investors' contributions went to pay sales agents' commissions. (Ex. 11-16).

196. The May 2006 illustration disclosed that investors' contributions went to, among other things, "Sales and Marketing Load." (Ex. 16).

197. The Sales and Marketing Load figure was actually the sales agents' commissions (Tr. 136).

198. In addition, the Companies maintained documents that showed the amounts they took from investors' contributions, but they did not show these to investors. Specifically, the Companies did not show investors or potential investors: (1) the sales agent contracts (Ex. 26), which included a table showing the commissions the sales agents received (Ex. 26, Tr. 274); (2) the batch headers (Ex. 56), which showed how investors' contributions were spent (Tr. 510); or (3) the Companies' own computer files (Ex. 55), which showed how investors' contributions were spent (Tr. 510-12).

199. Verdeja admitted that sales agents were instructed to disclose the commissions, fees, and profits the Companies deducted only if asked. (Tr. 130-31). Verdeja testified there was nothing that the agents were to say orally to potential investors. (Tr. 348).

200. As the Companies' regional director Alfredo Tognetti testified at trial, "[T]he customer ask me, I tell them. If they don't ask, basically we show the illustration and we tell them about how much he's putting and see your money grow." (Tr. 498).

201. The Companies selected the mutual funds they offered to investors (Ex. 119), and some of these funds were Fidelity mutual funds (Ex. 2-9).

202. The Companies have received a fee from Fidelity, which was about $100,000 per year, every year since 2004. (Tr. 657-59).  Specifically, Fidelity paid the trustee bank a 1.5% fee based on the USPT investors' Fidelity portfolios, and the Companies receives half of this fee. The Defendants chose to offer Fidelity funds, highlighted them in their marketing materials (Ex 2-9), yet failed to disclose this conflict of interest.

203. The marketing materials included misleading statements about the safety of the investment plans.  For example, according to the Executive Plan brochure, "[r]igorous examination by the Federal Reserve Bank, the Comptroller of the Currency, internal and external auditors and regulation by the Securities and Exchange Commission, ensure that the highest standards of safety, discretion, and confidentiality were followed reassuring the integrity of our commitment." (Ex 2-4).

204.  The brochures also stated "For the last two decades, . . . [USPT's] commitment allowed us to grow and emerge as the only company serving the international market with products managed and regulated in the United States." (Ex. 2-4).

205. On the website during the time Regions was trustee, from 2004 until now, the Defendants represented that "Our products are regulated by the Office of Comptroller of the Currency, The Federal Reserve Bank, and the Securities and Exchange Commission, reassuring the integrity of our commitment." (Ex 128, Tr. 469-70).

206. These statements were misleading because, among other things, USPT has only been in existence since 1995, not two decades.  The statements were also misleading because they implied USPT and its investment plans were regulated, but the Companies never registered with the Commission in any capacity and never registered their products with any government agency. (Tr. 188).

207. The Defendants claim they assumed their disclosures were adequate because the trustee banks never told them they were not. (Tr. 984).  However, the Companies and their liaison to the trustee banks, Verdeja, did not talk to the trustee banks about whether the Companies should disclose commissions, fees, and profits or whether they were complying with

federal law. (Tr. 357-58).

208. USPT's investors complained about fees, commissions, and profits taken from their money. (Tr. 363).

209. Verdeja was aware of investors' complaints about fees, commissions, and profits taken from their contributions. (Tr. 363).

210. In 2001, the Companies received a letter from a former sales agents' lawyer (Ex. 155, 2001 Letter) (Tr. 359). The 2001 Letter concerned perceived problems with the Companies' disclosures to potential investors. (Tr. 362). The Companies did not change their practices after reviewing the letter. (Tr. 362).

211. Two investor witnesses testified their USPT sales agents never disclosed the actual specific commissions, fees, and costs to be deducted from their contributions. (Tr. 773-74; Huerta Dep. 39-40).

**VI.  Likely Future Conduct**

212. The Individual Defendants have reached an agreement with Cayman National Bank to continue USPT's business. (Tr. 262). Pursuant to that agreement, a company called International Fiduciary Solutions ("IFS") will replace USPT. (Tr. 259).

213. IFS operates the same type of business that USPT does, using similar marketing materials. (Tr. 263).  IFS offers investment plans that include mutual funds, trusts, and insurance (Tr. 263-64).

214. IFSF is a joint venture created in 2008 between the Individual Defendants, on the one hand, and Cayman National Bank on the other, pending the resolution of the trial in this case. (Tr. 259). Until the resolution of this case, IFS is owned by Cayman National Bank (Tr. 268-69).

215.  USPT has already provided IFS with USPT investor and agent lists and contact information, and brochures (Tr. 262-63). The Individual Defendants helped IFS make its marketing brochure. The IFS marketing brochure is circulating and there are currently sales efforts through IFS. IFS has also solicited USPT investors. (Tr. 267-68).

## CONCLUSIONS OF LAW

1.  Subject matter jurisdiction exists under the Securities Act and the Exchange Act even though most of the investors were non-U.S. residents. *SEC v. Berger*, 322 F.3d 187, 194 (2d Cir. 2003) ("Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners, at least in the context of suits by the SEC or by named foreign plaintiffs."). Courts have traditionally applied two factors to determine if jurisdiction applies to fraudulent foreign transactions: (1) whether the wrongful conduct occurred in the U.S., and (2) whether the wrongful conduct had a substantial effect in the U.S. or on United States citizens. *Id.* at 191; *SEC v. Wolfson*, 03-C914, 2003 WL 23356418 at *15 (D. Utah Dec. 10, 2003). Jurisdiction exists if only one factor is established. *Berger*, 322 F.3d at 195. Here, jurisdiction exists under the first factor, the "conduct test" because, among other factors, the Defendants operated out of Florida.

2.  The SEC must prove the violations by a preponderance of the evidence. *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004) (the "SEC must prove violations of § 10(b) and § 14(e), and their supplementary Rules, by a preponderance of the evidence, and may use direct or circumstantial evidence to do so"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30 (1983) (10(b) suit proven by preponderance of the evidence); *SEC v. CM Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943) (17(a) suit proven by preponderance of the evidence).

**I**. **Count I**

3.   Count I charges all the Defendants with violating Section 17(a)(1) of the Securities

Act.  Section 17(a) of the Securities Act makes it unlawful "in the offer or sale of" securities, by

jurisdictional means, to:

> (1) employ any device, scheme or artifice to defraud;
> (2) obtain money or property by means of any untrue statement of a material
> fact or any omission to state a material fact necessary to make the
> statement made not misleading; or
> (3) engage in any transaction, practice, or course of business which operates
> or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

4.   "To show a violation of section 17(a)(1), the SEC must prove (1) material

misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3)

made with scienter." *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing

*Aaron v. SEC*, 446 U.S. 680, 695 (1980)).

5.   Participating in a course of business that operates as a fraud on the buyers or sellers of

stock can qualify as making a misrepresentation.  *SEC v. Zandford*, 535 U.S. 813, 819-22 (2002);

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972).

6.   In order for a misrepresentation or omission to be material, the facts misrepresented or

omitted must be "material in the sense that a  reasonable investor might have considered them

important in the making of this decision."  *Affiliated Ute Citizens*, 406 U.S. at 153-54.  More

specifically, "there must be a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available."  *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

7.  "[I]f a company chooses to make a statement on a subject, having chosen to speak, the company is obligated to make a full and fair disclosure." *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1267 (S.D. Fla. 1995) (citing *Dominick v. Dixie Natl Life Ins. Co.*, 809 F. 2d 1559, 1571 (11th Cir. 1987) ([O]nce [defendant] undertook to speak, it was required to make a full and fair disclosure.")).  Truthful statements can be misleading when someone omits to state a material fact without which the truthful statement, based on the circumstances, becomes misleading.  17 C.F.R. § 240.10b-5 (in the context of Rule 10b-5); *Ivax Corp.*, 920 F. Supp. at 967.  "The test for materiality of an omission is 'whether a reasonable man would attach importance to the fact omitted in determining a course of action.'  *Merchant Capital*, 483 F.3d at 768 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 719 (11th Cir. 1983)).

8.  The misrepresentations and omissions made by the Corporate Defendants, pursuant to a course of business which the Individual Defendants participated in, are material misrepresentations or omissions connected to the offer or sale of securities.  Specifically, Defendants' failure to disclose the total amounts taken from contributions, including commissions of 70% or more, fees, and profits, particularly when they sometimes misleadingly disclosed much lower costs, constituted a material misrepresentation or omission.  *See SEC v. Levine*, 671 F. Supp. 2d 14, 30 (D.D.C. 2009) ("there should be no doubt that the [Defendants'] failure to disclose the agents' commissions of over 75% was also a material misrepresentation.").  Their 2001 and 2002 graphs were wholly inadequate to disclose total plan costs.  When a May 2006 illustration did disclose the amount taken from contributions, its graphs nonetheless misleadingly depicted that contributors would begin making profits immediately (by showing accumulated money as being higher than contributed money), rather than taking five years to

-34-

break even.  (Ex. 16).  The failure to disclose the financial relationship between the Companies and Fidelity and the statement that the Companies products were regulated by the United States were also, under the facts of this case, misleading.

9.  These misrepresentations and omissions were made in connection with the offer or sale of securities.

10.  The Supreme Court has defined scienter in this context as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  In the Eleventh Circuit, scienter may be established by a showing of knowing misconduct or severe recklessness.  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (citation omitted); *see also SEC v. Southwest Coal and Energy Co.*, 624 F.2d 1312 (5th Cir. 1980).  Mere negligence, however inexcusable, does not serve as scienter.  *Id.* at 815.

11.  The Plaintiff in this case has shown by a preponderance of the evidence that the Defendants in this case had scienter regarding the omissions and misrepresentations at issue. Accordingly, the Defendants are guilty of Count I.

**II**.  **Count II**

12.  Count II charges all Defendants with violating Sections 17(a)(2) and 17(a)(3) of the Securities Act.

13.  "[T]o show that the defendants violated section 17(a)(2) or 17(a)(3), the SEC need only show (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence."  *Merchant Capital, LLC*, 483 F.3d at 766.  Indeed, the elements of Sections 17(a)(2) and (3) of the Securities Act are the same as for Section 17(a)(1), except the SEC does not have to prove scienter, only negligence. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).  The analysis and the result regarding material misrepresentations or omissions connected to the offer or sale of securities are accordingly the same for Count II as they were for Count I.

14.  The Court finds by a preponderance of the evidence that these misrepresentations and omissions were made with negligence, at the least.  Accordingly, the Defendants are guilty of Count II.

**III**. **Count III**

15.  Count III charges all Defendants with violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act ("Exchange Act").  "The scope of liability under Section 10(b) and Rule 10b-5 is the same."  *Merchant Capital*, 483 F.3d at 766 n. 17.

16.  Section 10(b) of the Exchange Act provides in pertinent part that "it shall be unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

17.  Rule 10b-5, promulgated under the Exchange Act, provides in pertinent part:

It shall be unlawful for any person, directly or indirectly,

-36-

> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading; or
> (c) To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in connection with the
> purchase or sale of any security.

17 C.F.R. § 240.10b-5.

18.   Along with section 17(a), Section 10(b) and Rule 10b-5 "both prohibit essentially the

same type of practices." *SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *16 (S.D.Fla.

2008) (citing *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979)).  "To prove a 10(b)

violation, the SEC must show (1) material misrepresentations or materially misleading

omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter."

*SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron v. SEC*, 446

U.S. 680, 695 (1980)).

19.   The Court makes the same findings in connection to Count III that it did with respect

to Count I.  Accordingly, the Court finds the Defendants guilty of Count III.

## IV.  Count IV

20.   Count IV charges the Corporate Defendants as primary violators of Section 15(a)(1)

of the Exchange Act.  In its entirety, Section 15(a)(1) provides:

> It shall be unlawful for any broker or dealer which is either a person other than a
> natural person or a natural person not associated with a broker or dealer which is a
> person other than a natural person (other than such a broker or dealer whose
> business is exclusively intrastate and who does not make use of any facility of a
> national securities exchange) to make use of the mails or any means or
> instrumentality of interstate commerce to effect any transactions in, or to induce
> or attempt to induce the purchase or sale of, any security (other than an exempted
> security or commercial paper, bankers' acceptances, or commercial bills) unless
> such broker or dealer is registered in accordance with subsection (b) of this

section.

21.  Under Section 15(a)(1) of the Exchange Act, a broker or dealer must register with the SEC before it can use the mails or any instrumentality of interstate commerce to effect any transaction in the purchase or sale of a security.  15 U.S.C. § 78o.

22.  Section 3(a)(4)(A) of the Exchange Act defines "broker" as a person "engaged in the business of effectuating transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4).

23.  "In determining whether a person has acted as a broker, several factors are considered. These factors include whether the person: 1) actively solicited investors; 2) advised investors as to the merits of an investment; 3) acted with a 'certain regularity of participation in securities transactions'; and 4) received commissions or transaction-based remuneration."  *SEC v. Corporate Relations Group, Inc.*, No. 99-CV-1222, 2003 WL 25570113, at *17 (M.D. Fla. 2003) (citing *In re Kemprowski & the Cambridge Consulting Co.*, Exchange Act Release No. 34-35058, 1994 WL 684628, at *2 (Dec. 8, 1994)).  Courts have also considered whether the alleged broker 5) is an employee of the issuer; 6) is selling, or previously sold, the securities of other issuers; 7) is involved in negotiations between the issuer and the investor; 8) analyzes the financial needs of an issue; 9) recommends or designs financing methods; 10) discusses the details of securities transactions; and 11) makes investment recommendations. *SEC v. Corporate Relations Group, Inc.*, No. 99-CV-1222, 2003 WL 25570113, at *17 (M.D. Fla. 2003); *Salamon v. Teleplus Enterprises, Inc.*, No. 05-2058, 2008 WL 2277094, at *8 (D.N.J. 2008); *See also S.E.C. v. Bravata*, No. 09-12950, 2009 WL 2245649 (E.D. Mich. 2009).

24.  As discussed in the Court's factual findings, Defendants meet the requirements of

-38-

being brokers, because they actively solicited investors, advised them on the merits of investments, regularly participated in securities transactions, received commissions, and sold securities from several different issuers.  Based on the Court's factual findings and a weighing of the factors, the Court concludes that the Corporate Defendants are brokers.

25.  Mutual fund shares, such as those at issue in this case, are securities.  *See Tcherepnin v. Knight*, 389 U.S. 332, 343 (1967) ("we have little doubt that such [mutual fund] shares are securities within the meaning of the Securities Exchange Act.").

26.  As discussed in the factual findings, the Corporate Defendants made use of the mails and other instrumentalities of interstate commerce in order to effect transactions in or to induce the purchase or sale of securities.

27.  It is undisputed that the Corporate Defendants have never registered as brokers, or in any capacity, with the SEC.  Accordingly, the Court finds that the Corporate Defendants are guilty of Count IV.

**V**.  **Count V**

28.  Count V charges the Individual Defendants with aiding and abetting violations of Section 15(a)(1) of the Exchange Act.

29.  "For aiding and abetting liability under the federal securities laws, three elements must be established: (1) a primary or independent securities law violation committed by another party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; also conceptualized as scienter in aiding and abetting antifraud violations; and (3) that the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation."  *Woods v. Barnett Bank*, 765 F.2d 1004, 1009 (11th Cir.

1985); *SEC v. K.W. Brown and Co.*, 555 F.Supp.2d 1275, 1306 (S.D. Fla. 2007). The primary securities law violation at issue was established in Count IV.

30.  The knowledge or awareness requirement can be satisfied by recklessness when the alleged aider and abettor is a fiduciary or active participant. *SEC v. K.W. Brown & Co.,* 555 F. Supp. 2d 1275, 1306-07 (S.D. Fla. 2007). As discussed in the Court's findings of fact, all the Individual Defendants were active participants, acting as corporate officers and directors and even translating marketing materials. The Court finds that this shows an awareness or knowledge by the Individual Defendants that their role was part of an overall activity that was improper. It also shows the third factor, that the Individual Defendants knowingly and substantially assisted the conduct that constituted the violation, namely the Corporate Defendants acting as unregistered broker-dealers. Accordingly, the Court finds the Individual Defendants guilty of Count V.

**VI**.  **Relief**

**A**.  **Injunction**

31.  Plaintiff SEC has requested a permanent injunction. The Security Act specifically provides that the SEC may bring an action in district court to enjoin violations of securities law. 15 U.S.C. § 77t.

32.  To obtain an injunction, the SEC must prove by a preponderance of the evidence that (1) Defendant(s) violated the securities laws and (2) that there is a reasonable likelihood that Defendant(s) will repeat the violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).

33.  The Commission does not have to show irreparable injury or a balance of the equities in the Commission's favor. *SEC v. Unifund SAL,* 910 F.2d 1028, 1036 (2nd Cir. 1990).

34.   In determining whether there is a reasonable likelihood that Defendants will repeat a violation of the securities laws, the Court should consider the following factors: (1) the egregiousness of the defendant(s)' actions, (2) the isolated or recurrent nature of the violations, (3) the degree of scienter involved, (4) the Defendants' recognition of the wrongful nature of their conduct, (5) the sincerity of the Defendants' assurances against future violations, and (6) the likelihood that the defendant(s)' occupation will present opportunities for future violations. *Calvo*, 378 F.3d at 1216.   Having considered all these factors, the Court finds that there is a reasonable likelihood that Defendants will repeat a violation of the securities laws.

35.   In *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1321 (11th Cir. 1982), the Eleventh Circuit held that the public nuisance exception to the general principal of American jurisprudence, that "equity will not enjoin a crime," applied to violations laws.   Therefore, the Eleventh Circuit held that a court could "an injunction to issue to prohibit the violation of the securities laws." *Id*.   Dicta in *SEC v. Smyth*, 420 F.3d 1225, 1233 n. 14 (11th Cir. 2005) stating that such injunctions are unenforceable "obey the law" injunctions is not, therefore, controlling. *See SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004) (finding that it was clear error for the district court to fail to issue an injunction against future violations of the securities laws and regulations where every factor weighed in favor of an injunction); *SEC v. Solow*, 554 F. Supp. 2d 1356, 1361-62 (S.D. Fla. 2008) (discussing the "obey the law" injunctions in the context of securities law).   Accordingly, the Court will issue the requested injunctive relief.

**B**.   **Disgorgement**

36.   Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230

(D.C. Cir. 1989); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1103-04 (2nd Cir. 1972) ("the

effective enforcement of the federal securities laws requires that the SEC be able to make

violations unprofitable").

37. "The Eleventh Circuit Court of Appeals does not require precision in determining

the proper amount of disgorgement." *SEC v. Utsick*, No. 06-20975-CIV-HUCK, 2009 WL

1404726 at *12 (S.D. Fla. May 19, 2009) (citing *First City,* 890 F.2d at 1231; *SEC v. ETS

Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005)). The amount of disgorgement ordered

"need only be a reasonable approximation of profits causally connected to the violation." *Utsick*,

2009 WL 1404726 at *12 (quoting *First City,* 890 F.2d at 1231). *See also SEC v. ETS

Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) ("The SEC's burden for showing the

amount of assets subject to disgorgement . . . is light: a reasonable approximation of a

defendant's ill-gotten gains . . . Exactitude is not a requirement").

38.  The disgorgement amount should be calculated by measuring illegal profits, not

amount needed to reimburse defrauded investors. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

1475 (2nd Cir. 1996)); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC

v. Manor Nursing Ctrs*, 458 F.2d 1082, 1103-04 (2nd Cir. 1972) ("the effective enforcement of

the federal securities laws requires that the SEC be able to make violations unprofitable").

"Disgorgement should recapture 'all gains flowing from the illegal activities.'" *Utsick*, 2009 WL

1404726 at *12 (quoting *SEC v. Cross Fin. Servs*., 908 F.Supp. 718, 734 (C.D. Cal. 1995)).

"Where the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits

stemming from the scheme." *Id*. (citing *CFTC v. British Am. Commodity Options Corp*., 788

F.2d 92, 93-94 (2nd Cir.), *cert. denied*, 479 U.S. 853 (1986).

39. A burden-shifting analysis applies to calculations of disgorgement. Once the Commission presents evidence reasonably approximating the amount of a Defendant's ill-gotten gains, then the burden of proof shifts to the defendant. *See First City*, 890 F.2d at 1232; *see also SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997). The defendant is then "obliged to *clearly* demonstrate the disgorgement figure is not a reasonable approximation." *Utsick*, 2009 WL 1404726 at *12 (emphasis in original). *See also First City*, 890 F.2d at 1232. Any "risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty." *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1370 n.11 (S.D. Fla. 2006) (citing *SEC v. Inorganic Recycling Corp.,* 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002)).

40. "The burden is on the tortfeasor to establish that the liability is capable of apportionment, and the district court has broad discretion in subjecting the offending parties on a joint-and-several basis to the disgorgement order." *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (internal citations omitted). In this case, the Individual Defendants have showed that they did not receive any proceeds from the unlawful activity beyond their own salaries.

41. The Court therefore finds that the Corporate Defendants must disgorge the $62.6 million in investor contributions. Of that sum, Defendant Iliana Macieras is jointly and severally liable for $1,093,364, representing the salary she was paid. Defendant Leonardo Maceiras Jr. is jointly and severally liable for $674,567 of that sum, representing his salary. Defendant Nildo Verdeja is jointly and severally liable for $993,515 of that sum, representing his salary.

42. The SEC also seeks prejudgment interest.   Where a securities law violator has

enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is consistent with the equitable purpose of disgorgement. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3rd Cir. 1997). "Prejudgment interest on damages awarded pursuant to a violation of the federal securities laws is a matter of judicial discretion. In exercising its discretionary powers, a court must consider both compensation and fairness. An award of prejudgment interest is intended to compensate an aggrieved party for the wrongful deprivation of its money." *Id*. at 1089.

43. Accordingly, the Court orders the Defendants to pay prejudgment interest in the amount calculated from the filing of the complaint in this case on September 28, 2007 through January 29, 2010. Prejudgment interest will be calculated in accordance with the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis. *SEC v. Poirier*, 140 F. Supp. 2d 1033, 1047 (D. Ariz. 2001).

**C**. **Civil Penalties**

44. The SEC seeks the imposition of a penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3).

45. "Civil penalties are divided into a three-tier system, whereby the first tier allows an amount, for each violation, not to exceed the greater of $5,000 or the 'gross amount of pecuniary gain to the defendant as a result of the violation;' and the third tier provides for the greater of $100,000 for a natural person, 'or the gross amount of pecuniary gain to such defendant as a result of the violation, if (I) the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and  (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of

-44-

substantial losses to other persons.'"   *SEC v. KS Advisors, Inc.*, No. 2:04-CV-105-FTM-29, 2006 WL 288227 at *3 (M.D. Fla. Feb. 6, 2006) (quoting 15 U.S.C. § 77t(d)(2)(A), (C)).

46.   In deciding penalty amounts, courts consider (1) the egregiousness of the defendants' conduct; (2) the degree of their scienter; (3) whether their conduct created substantial losses or the risk of substantial losses to others; (4) whether the conduct was isolated or recurrent; and (5) whether the court should reduce the  penalty due to the defendants' demonstrated current and future financial condition.  *SEC v. Opulentica, LLC*¸ 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

47.   The Defendants' conduct was wrongful, recurrent, and created losses or the risk of losses to others in the form of undisclosed high commissions and fees.  The Defendants also acted with scienter.  However, neither their conduct nor their scienter was egregious on the level of many other securities law violations, such as ponzi schemes.  Fees were disclosed upon request.  Investor funds were invested, albeit in smaller amounts than the investors realized, and the Defendants' relatively modest salaries over a period of eleven years will be disgorged.  Under those circumstances, the Court will not award the maximum civil penalty the SEC seeks. Furthermore, as the degree of loss was not a factor in any of the violations at issue here, the actual loss and risk of loss suffered by the investors over the course of their investments was not fully developed at trial outside of hypotheticals or individual anecdotes.  Accordingly, the Court will not impose third tier civil penalties.

48.   Having considered the factors listed above in determining penalty amounts, the Court will impose second tier penalties in the amount of $50,000,000 against the Corporate Defendants and $200,000 against each Individual Defendant.

Therefore, after careful consideration, it is hereby:

-45-

**ORDERED AND ADJUDGED** that The Defendants are found guilty of Counts I-III.

The Corporate Defendants are found guilty of Count IV, and the Individual Defendants are found

guilty of Count V.  This case is CLOSED.  Final Judgment as provided in these Findings of Fact

and Conclusions of Law shall be entered by separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 30th day of September,

2010.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record